Carl CHASE, Appellant,

v.

**PUBLIC DEFENDER SERVICE,**
**et al., Appellees.**

No. 06–CV–1281.

District of Columbia Court of Appeals.

Argued March 12, 2008.
Decided Sept. 11, 2008.

Michael Lasley, for appellant.

John F. Cooney, with whom Robert L. Wilkins and Brian M. Hudson, Washington, DC, were on the brief, for the Public Defender Service.

Before FISHER and BLACKBURNE–RIGSBY, Associate Judges, and FERREN, Senior Judge.

FISHER, Associate Judge:

The Office of Employee Appeals ("OEA") dismissed an appeal filed by appellant Carl Chase, a former employee of the Public Defender Service for the District of Columbia ("PDS"), and Chase now asks us to reverse a judgment of the Superior Court which affirmed that decision. Concluding that the District of Columbia Comprehensive Merit Personnel Act, D.C.Code §§ 1–601.01 *et seq.* (2001) ("CMPA"), does not apply to PDS, and agreeing that the OEA therefore lacked jurisdiction over appellant's petition, we affirm.

## I. Events Leading to this Appeal

On January 10, 2001, PDS sent Carl Chase a "Notice of Final Decision" terminating him from his non-attorney position as Deputy Chief of the Criminal Justice Act Office effective January 15, 2001. The Notice stated that Chase had "the right to appeal" the termination "to the Office of Employee Appeals and also ... to the PDS Board of Trustees," but that any appeal "must be filed ... by February 15, 2001." Chase "filed a Petition for Appeal" with the OEA on February 12, 2001, and the case was assigned to an Administrative Judge ("ALJ") on March 14, 2003.

On August 1, 2003, PDS "requested that [Chase's Petition for Appeal] be dismissed, asserting ... that the [OEA] lacked jurisdiction to decide this matter because ... a change in the law ... exempted [PDS] from [the OEA's] continuing jurisdiction...."[1] The ALJ agreed with PDS, "conclud[ing], as a matter of law, that the U.S. Congress intentionally removed PDS from the control of the District of Columbia, and as such, PDS is not subject to CMPA or the District's personnel regulations and policies." He dismissed Chase's petition on October 3, 2003. Chase then petitioned for judicial review and, in a September 29, 2006, opinion, the Superior Court affirmed, concluding "that the OEA's decision that it does not have jurisdiction to hear the case is well supported in fact and the law." Chase timely filed notice of this appeal.

## II. Standard of Review

▆▆▆ This appeal presents an issue of first impression for this court—whether the enactment of the National Capital Re-

---

1. PDS also argued that, even if the OEA had jurisdiction over some personnel decisions made by PDS, it lacked jurisdiction over Chase's petition due to his "Excepted Service" status. *See* D.C.Code § 1–609.05 (2001). We need not reach this second argument because we conclude more generally that the OEA no longer has jurisdiction to review PDS personnel actions.

vitalization and Self–Government Improvement Act of 1997, Pub.L. No. 105–33, §§ 11000–11723, 111 Stat. 251, 712–87 (August 5, 1997) ("the Revitalization Act"), and the District of Columbia Courts and Justice Technical Corrections Act of 1998, Pub.L. No. 105–274, 112 Stat. 2419 (October 21, 1998) ("the 1998 Amendments"), altered the status of PDS in such a way that its employees no longer have a right of appeal to the OEA. *But see Public Defender Service v. (Julia) Chambers Saint–Preux* (sometimes referred to by the parties as "*Chambers*"), 691 A.2d 1160, 1161 (D.C.1997) (upholding as reasonable "OEA's interpretation of the CMPA as covering PDS non-attorney employees"). The impact of this legislation on our decision in *Saint–Preux,* and the current application of the CMPA to PDS, are questions of statutory construction that we review *de novo. Richardson v. Easterling,* 878 A.2d 1212, 1216 n. 5 (D.C.2005) (question of statutory construction is a "quintessential issue of law subject to de novo review").[2]

■ " 'The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used.' " *Chamberlain v. American Honda Fin. Corp.,* 931 A.2d 1018, 1023 (D.C.2007) (internal citations omitted). We generally " 'defer to the agency's interpretation of the statute and regulations it administers[,]' " *Colbert v. District of Columbia Dep't of Employment Servs.,* 933 A.2d 817, 819 (D.C.2007) (internal citation omitted), but we will not

accord such deference here because the Revitalization Act and the 1998 Amendments are *not* statutes that the OEA administers.[3] Thus, the OEA's interpretation does not limit our analysis in any way.

### III. Analysis

■ Thorough review of the Revitalization Act and the 1998 Amendments compels the conclusion that Congress changed the relationship of PDS to the District of Columbia government. We therefore hold that the appeal rights established in the CMPA no longer apply to PDS or its employees. While this holding conflicts with our decision in *Saint–Preux, see* 691 A.2d at 1161 ("[upholding the] OEA's interpretation of the CMPA as covering PDS non-attorney employees . . ."), the Revitalization Act and the 1998 Amendments drastically changed the legislative landscape and the reasoning of *Saint–Preux* no longer applies. *See East v. East,* 536 A.2d 1103, 1106 (D.C.1988) (we our not bound by our prior decisions when the legislature has changed the applicable law).

### A. The CMPA and the Jurisdiction of OEA

With some exceptions not relevant to this appeal, the CMPA "appl[ies] to all employees of the District of Columbia government. . . ." D.C.Code § 1–602.01(a) (2001). The "purpose and policy" of the CMPA are "to assure that the District of Columbia government shall have a modern flexible system of public personnel admin-

---

**2.** "Although this appeal comes to us from the Superior Court, our scope of review is precisely the same as in administrative appeals that come to us directly." *Johnson v. District of Columbia Office of Employee Appeals,* 912 A.2d 1181, 1183 (D.C.2006) (internal quotation marks and citation omitted).

**3.** The OEA was created by the CMPA, and it is charged with adjudicating administrative appeals under that act. *See* D.C.Code §§ 1–

601.01 *et seq.* (2001). Although the Revitalization Act and the 1998 Amendments affect whether PDS falls within the coverage of the CMPA and the jurisdiction of the OEA, that legislation does not mention the OEA, nor does it amend the portions of the CMPA dealing with employee appeals. Our primary task in this appeal is to interpret the impact of the federal legislation on PDS.

istration, which shall ... [among other things,] [c]reate uniform systems for personnel administration among the executive departments and agencies reporting directly to the Mayor of the District of Columbia and among independent agencies, boards, and commissions in the District of Columbia government...." D.C.Code § 1–601.02(a). The CMPA defines the term " 'employee' " to mean "an individual who performs a function of the District government and who receives compensation for the performance of such services." D.C.Code § 1–603.01(7). "The term 'independent agency' means any board or commission of the District of Columbia government not subject to the administrative control of the Mayor...." D.C.Code § 1–603.01(13).[4] "The term 'boards and commissions' means bodies established by law or by order of the Mayor of the District of Columbia consisting of appointed members to perform a trust or execute official functions on behalf of the District of Columbia government." D.C.Code § 1–603.01(2).[5]

The OEA, "an independent administrative adjudicatory agency created by the [CMPA,]" 6 DCMR § 600.1 (2008), has the authority to "[h]ear and adjudicate appeals received from District agencies and from employees as [further] provided...." D.C.Code § 1–606.02(a)(2) (2001); see D.C.Code § 1–606.01(a) (requiring members of the OEA to "have demonstrated knowledge concerning personnel management or labor relations"). The regulation defining the OEA's jurisdiction provides that, with certain exceptions, "any District of Columbia government employee may appeal [to the OEA] a final agency decision affecting: (a) A performance rating which results in removal of the employee; (b) An adverse action for cause that results in removal, reduction in grade, or suspension for ten (10) days or more; or (c) A reduction-in-force." 6 DCMR § 604.1.

## B. The *Saint–Preux* Decision

In *Saint–Preux*, we reviewed "a decision of the Superior Court affirming an order of the [OEA] in a personnel action brought by [ ] a non-attorney former employee of [PDS]." *Id.* at 1161. We likewise affirmed, holding "that [the] OEA's interpretation of the CMPA as covering PDS non-attorney employees [was] reasonable and consistent with both the statutory language and the legislative purpose." *Id.*[6]

---

4. At the time PDS terminated Mr. Chase, D.C.Code § 1–603.01(13) listed several examples of an "independent agency,"

 including, but not limited to, the District of Columbia Board of Education, the Board of Trustees of the University of the District of Columbia, the Board of Library Trustees, the Armory Board, the Board of Elections and Ethics, the Public Service Commission, the Zoning Commission for the District of Columbia, the Public Employee Relations Board, the District of Columbia Retirement Board, and the Office of Employee Appeals. For the purposes of this chapter, the Council of the District of Columbia shall be considered an independent agency of the District of Columbia. For the purposes of subchapter XXVIII of this chapter, the Washington Metropolitan Area Transit Commission shall be considered an independent agency of the District.

5. The original version of the CMPA included the Board of Trustees of the Public Defender Service in a long list of boards and commissions. D.C.Code § 1–333.1(b) (1979). In 1980, the Council deleted the entire list and adopted the generic definition of "boards and commissions" quoted above. *See* D.C. Law 3–81, § 2(c), 27 D.C. Reg. 2632 (1980).

6. At that time, the statute did not specifically list PDS as either an "independent agency" or a "board or commission." We considered and rejected PDS's argument "analogiz[ing] its non-attorney employees to the 'nonjudicial personnel' of the District of Columbia court system, who are exempt from coverage by the Act." *Id.*; *see* D.C.Code § 1–602.01(a) (2001). We noted, but did not explicitly address, the position of PDS that it was "neither an agency under the personnel authority of the Mayor

In the Notice of Final Decision issued in this case, the Director of PDS explained that "[e]mployees of PDS are covered by the CMPA pursuant to *Public Defender Service v. Saint–Preux*, 691 A.2d 1160 (D.C.1997)."

When we decided *Saint–Preux*, Congress had yet to pass the Revitalization Act. *Compare Saint–Preux* (decided April 3, 1997), *with* The Revitalization Act, 111 Stat. 251 (enacted August 5, 1997). We now must decide whether the Revitalization Act and the 1998 Amendments changed the status of PDS in a way that eliminated OEA's jurisdiction over PDS personnel decisions.

### C. The Revitalization Act and 1998 Amendments

PDS came into existence in 1970, when Congress re-designated the Legal Aid Agency for the District of Columbia as the District of Columbia Public Defender Service. *See* Title III of the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, §§ 301–09, 84 Stat. 473, 654–57 (July 29, 1970) (the "Court Reform Act"), codified at D.C.Code §§ 1–2701 *et seq.* (1981). This change was part of a comprehensive effort to reorganize the courts of the District of Columbia and to transfer responsibility for most local litigation to a new "local, unified, modern court system for the District of Columbia." H.R.Rep. No. 91–907, p. 23 (1970). *See generally Swain v. Pressley*, 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977); *Pernell v. Southall Realty*, 416

U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974); *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973).

When it enacted the Revitalization Act in 1997, Congress shifted control over several criminal justice functions from the District of Columbia to the federal government.[7] As part of that effort, the Revitalization Act amended several D.C. Code provisions dealing with PDS (although many of these changes were repealed the following year). *See* The Revitalization Act, §§ 11000, 11232–4, 11271–72, 111 Stat. at 712, 746–51, 761–63; D.C.Code §§ 2–1601 *et seq.* (2001).

The Revitalization Act established a new entity, named the "District of Columbia Offender Supervision, Defender, and Courts Services Agency" ("the Agency" or "OSDCSA"), "within the executive branch of the Federal Government[.]" The Revitalization Act, § 11233(a), 111 Stat. at 748. That agency's Director would be "appointed by the President, by and with the advice and consent of the Senate...." *Id.* at § 11233(b), 111 Stat. at 748. The act also altered the status of two existing agencies, "[t]he District of Columbia Pretrial Services Agency [("PSA")] ... and the District of Columbia Public Defender Service ...," which would now "function as independent entities within the Agency." The Revitalization Act, § 11233(e)(1), 111 Stat. at 750. Thus, as a result of the Revitalization Act, OSDCSA would be a *federal* agency, directed by a Presidential appointee, and PDS and PSA would be indepen-

nor an independent agency...." *Saint–Preux*, 691 A.2d at 1161.

7. *See* The Revitalization Act, § 11201 (closing Lorton Correctional Complex and transferring sentenced felons to the custody of the federal Bureau of Prisons), § 11231 (abolishing the District of Columbia Board of Parole and transferring authority for parole supervision to the United States Parole Commission),

§ 11233 (establishment of the District of Columbia Offender Supervision, Defender, and Court Services Agency within the executive branch of the federal government), and § 11241 (direct funding of the Superior Court of the District of Columbia, the District of Columbia Court of Appeals, and the District of Columbia Court System by the federal government), 111 Stat. at 734–52.

dent entities *within that federal agency.* *See id.* §§ 11233(a), (e)(1), 111 Stat. at 748, 750.

The statutes governing PDS changed yet again when Congress made several amendments to the Revitalization Act and removed PDS from OSDCSA. *See* The 1998 Amendments, Pub.L. No. 105–274, § 7, 112 Stat. at 2425–28. Although the 1998 Amendments essentially repealed all the provisions of the Revitalization Act dealing with PDS, *see id.* § 7(a) ("removing [PDS] from jurisdiction of [OSDC-SA]"), and § 7(d) (repeal of § 11272 of the Revitalization Act, dealing with PDS), they did not merely revive the previous statutes. The 1998 legislation added new subsections to some of the D.C. Code provisions dealing with PDS. *See id.,* § 7(e)-(f). Thus, although the 1998 Amendments removed PDS from its place within the new federal agency (now known as "CSOSA"), they reinforced the conclusion that PDS is independent of the Mayor and the District of Columbia government, and gave PDS employees many of the same benefits enjoyed by federal employees. The effect of these changes may be appreciated by comparing certain D.C. Code provisions related to PDS that were in effect prior to the Revitalization Act with the corresponding statutes currently in place.[8]

Before the Revitalization Act, the Code authorized appropriations for PDS "out of any moneys in the Treasury to the credit of the District of Columbia...." D.C.Code § 1–2707(a) (1981 ed., 1992 Replacement Volume). "[B]udget estimates for [PDS were] prepared in consultation with the Mayor of the District of Columbia." *Id.* The current language authorizing appropriations no longer refers to the District of Columbia.[9] D.C.Code § 2–1607(a) (2001 & 2008 Supp.). PDS no longer prepares its budget in consultation with the Mayor, but "submit[s] an annual appropriations request" directly to the federal "Office of Management and Budget." D.C.Code § 2–1607(a) (2001 & 2008 Supp.).

The Code previously required the PDS Board of Trustees ("Board") to "submit a fiscal year report of [PDS's] operations to [Congress], to the chief judges of the [federal and local courts in the District of Columbia], *and* to the Mayor of the District of Columbia." D.C.Code § 1–2706(a) (1981 ed., 1992 Replacement Volume) (emphasis added). The corresponding current provision, D.C.Code § 2–1606(a) (2001), no longer refers to the Mayor; instead, the report must be sent to Congress, to the chief judges, and to "the Office of Management and Budget."

Two new provisions, added by the 1998 Amendments, highlight the separation of PDS from the District of Columbia government. Section 2–1607(a) (2001) provides that

8. The current provisions that we highlight also were in effect during the proceedings leading to Chase's termination on January 15, 2001.

9. For a period of time following the Revitalization Act and the 1998 Amendments (and at the time PDS terminated Chase), the D.C. Code provided that PDS funds were "authorized to be appropriated through the Court Services and Offender Supervision Agency ... [to] be transmitted by the Agency ... to [PDS]." D.C.Code § 2–1607(a) (2001). In the past, Congress would direct the Office of Management and Budget to provide the Agency with its federal funds in quarterly apportionments. *See, e.g.,* District of Columbia Appropriations Act of 2006, Pub.L. No. 109–15, 119 Stat. 2396, 2510–11 (November 30, 2005). As reflected in the most recent version of D.C.Code § 2–1607(a) (2001 & 2008 Supp.), Congress now funds PDS directly. OMB still provides quarterly apportionments. *See* Consolidated Appropriations Act of 2008, Pub.L. No. 110–161, 121 Stat. 1844, 1992–93.

[PDS] may arrange by contract or otherwise for the disbursement of appropriated funds, procurement, and the provision of other administrative support functions by the General Services Administration or by other agencies or entities, *not* subject to the provisions of the District of Columbia Code or any law or regulation adopted by the District of Columbia Government concerning disbursement of funds, procurement, or other administrative support functions.

(Emphasis added.) Section 2–1607(c) (2001) provides that PDS "shall not be subject to any general personnel or budget limitations which otherwise apply to the District of Columbia government or its agencies in any appropriations act." [10]

Finally, although the federal legislation does not refer to employee appeal rights under the CMPA, several amendments to the D.C. Code transform the way in which the CMPA at large applies to PDS employees. Some of the most fundamental benefits and protections provided to District employees by the CMPA are health insurance, life insurance, worker's compensation, and retirement. *See* D.C.Code §§ 1–621.01–.16 (health insurance), – 622.01–.15 (life insurance), –623.01–.47 (worker's compensation), and –626.01–.14 (retirement). Under § 2–1605(c), however, "[e]mployees of [PDS] shall be treated as employees of the Federal Government solely for purposes of any of the . . . provisions of Title 5, United States Code . . . relating to compensation for work injuries, . . . retirement, . . . life insurance, and . . . health insurance." PDS "shall make contributions under [these] provisions . . . at

the same rates applicable to agencies of the Federal Government[,] . . . [and PDS employees may elect] to participate in the Thrift Savings Plan for Federal employees." D.C.Code § 2–1605(c)(2)–(3) (2001). These provisions, added in 1998, transfer PDS employees from the CMPA system of benefits to the federal system. Thus, the Revitalization Act and the 1998 Amendments made fundamental changes to the relationship between the CMPA and PDS employees.

### D. OEA No Longer Has Jurisdiction Over PDS

As we explained at the outset, the OEA has jurisdiction over appeals of District of Columbia government employees related to certain personnel actions, such as termination. *See* D.C.Code §§ 1–602.01(a), 1–603.01(7), 1–606.02(a)(2). The Revitalization Act and the 1998 Amendments leave many unanswered questions regarding the status of PDS employees and PDS as an entity. For example, as just discussed, D.C.Code § 2–1605(c) states that PDS employees "shall be treated as employees of the Federal Government *solely* for purposes of" enumerated provisions of the United States Code related to federal benefits. *Id.* (emphasis added). This language suggests that, although their agency is federally funded, PDS employees are not full-fledged federal employees. However, we need not address these broader questions in this appeal. We are satisfied that PDS employees are not District of Columbia government employees entitled to appeal to the OEA.[11] We therefore

---

10. We understand this language about "general personnel . . . limitations" to refer to limits on the number of persons who may be employed by various components of the District of Columbia government, not to the general personnel regulations of the District. In

other words, this language does not directly answer the question now before us.

11. D.C.Code § 2–1603(d) (2001) still provides that "[f]or the purposes of any action brought against the trustees of [PDS], they shall be deemed to be employees of the District of

hold that the OEA properly dismissed Chase's petition for lack of jurisdiction.[12]

### E. Chase Was Not Denied Due Process

 Chase argues that his due process rights were violated when PDS initially informed him that he had a right to appeal to the OEA, but then, after he had "detrimentally relied" upon that representation, persuaded the OEA to dismiss his appeal for lack of jurisdiction. Invoking principles of equity, he argues that the OEA should not have dismissed his appeal. Here, however, "there can be no estoppel. Parties cannot waive subject matter jurisdiction by their conduct or confer it ... by consent, and the absence of such jurisdiction can be raised at any time." *Customers Parking, Inc. v. District of Columbia,* 562 A.2d 651, 654 (D.C.1989) (internal quotation marks and citations omitted).

Even if it were fair to say that Chase "detrimentally relied" upon the representations of PDS when he appealed to the OEA, instead of appealing to the PDS Board of Trustees, any prejudice was cured when PDS renewed that option. On October 14, 2003, after the OEA dismissed his appeal for lack of jurisdiction, PDS wrote to Chase, offering him a second opportunity to appeal to the Board within the next thirty days. Because Chase declined to take advantage of this opportunity, he cannot demonstrate that he was deprived of due process. Moreover, it appears that he did not have a due process right to an appeal at all. *See, e.g., National Union of Marine Cooks & Stewards v. Arnold,* 348 U.S. 37, 43, 75 S.Ct. 92, 99 L.Ed. 46 (1954) ("While a statutory review is important and must be exercised without discrimination, such a review is not a requirement of due process."); *Poyner v. Police & Firemen's Retirement & Relief Board,* 456 A.2d 1249, 1251 (D.C.1983) ("due process ... does not require appellate review").

 We also reject Chase's argument that he was denied due process because neither the Administrative Judge nor the Superior Court "address[ed] or decide[d] whether [he] had any appellate rights to appeal his termination." He appears to concede that he did not raise this issue either before the OEA or on review in the Superior Court. Absent extraordinary circumstances, we will not consider an issue that was not presented to the administrative agency at the appropriate time. *See, e.g., Hisler v. District of Co-*

Columbia." This provision has been part of the Code since the creation of PDS in 1970 and was not altered by the Revitalization Act or the 1998 Amendments. It refers only to the trustees of PDS, not to PDS employees. We are not persuaded that this sentence, by itself, designates PDS employees as District employees covered by the CMPA despite the landmark changes wrought by the 1997 and 1998 Congressional legislation. There is an even broader provision in the D.C. Code related to the Pretrial Services Agency ("PSA"), *see* D.C.Code § 24–133(e)(4)(A) (2001) ("the Corporation Counsel of the District of Columbia shall provide litigation services to the [PSA]"), but the PSA clearly is an independent entity within a federal agency. *See* D.C.Code § 24–133(a) and (e)(1).

12. In presenting its arguments, PDS has referred to a letter from a Policy Manager at the District of Columbia Office of Personnel advising PDS that it "is not subject to the [CMPA], D.C. personnel regulations and policies, or [the] Mayor's personnel and pay authorities." Because it is not clear from the record that this letter represents the official position of the District of Columbia government, we have not relied upon it in reaching our decision.

Because the parties have not briefed the question, and no representative of the federal government has participated in this appeal, we express no opinion on whether PDS employees now have the same appeal rights as federal employees.

*lumbia Dep't of Employment Servs.,* 950 A.2d 738, 744 (D.C.2008); *Rafferty v. District of Columbia Zoning Comm'n,* 583 A.2d 169, 178 (D.C.1990). Here, we do not find any exceptional circumstances that would warrant departure from this general and salutary rule. Indeed, we have declined to render an advisory opinion on whether PDS employees have the same appeal rights as federal employees. See note 12, *supra.*

### IV. Conclusion

For the reasons discussed, we affirm the judgment of the trial court, which in turn affirmed the decision of the Office of Employee Appeals dismissing Chase's appeal for lack of jurisdiction.

*So ordered.*